[Civ. No. 2221. Fourth Appellate District.—March 9, 1939.]

H. C. WINKLEMEN, Appellant, v. DOUGLAS R. SIDES et al., Respondents.

388

390

W. M. Conley, Philip Conley, Matthew Conley, Conley, Conley & Conley and R. Z. Lamberson for Appellant.

Gibson, Dunn & Crutcher, H. F. Prince, Ira C. Powers and Frederic H. Sturdy, as *Amici Curiae*, on Behalf of Appellant.

David E. Peckinpah and Harold M. Child for Respondents.

MARKS, J.—This is an action to recover on a promissory note executed by Douglas R. Sides and guaranteed by G. W. E. White and R. W. Binkley. The note is dated August 19, 1932, and is for the principal sum of $3,375.45, payable on demand to the Bank of America National Trust & Savings Association, the assignor of plaintiff.

All defendants pleaded payment of the note. The guarantors interposed additional special defenses pertaining to them alone. The jury returned a general verdict in favor of the three defendants. Plaintiff urges that this demonstrates the verdict was based on an implied finding that the note had been paid. Otherwise, no verdict would have been returned in favor of Sides. There is much logic in this argument and we will adopt it in this opinion. If the judgment may be supported on the theory of payment it will be unnecessary for us to consider any of the questions raised under the special defenses of the guarantors. While defendants do not agree with this position, they cannot complain of our adoption of this theory, if the judgment is affirmed.

In order to properly understand the question before us it is necessary to recite in some detail the financial transactions of defendants with each other and with various banks which occurred during several years prior to the trial of this action in 1937.

For the sake of brevity we will refer to the Bank of America National Trust and Savings Association, as The Bank; to the Federal Land Bank of Berkeley, California, as the Land Bank; and, to the Pacific Coast Joint Stock Land Bank, as the Coast Bank.

Some years prior to 1932, defendants Sides and White, with one Wells, were interested in farming 160 acres of land in Tulare County. Title stood in the name of a corporation in which they were the sole stockholders. The corporation was indebted to a predecessor of the Selma branch of The Bank in a considerable sum. Binkley became interested in the farming venture but did not become a stockholder. The corporation was dissolved and its debts were assumed by the four men. Each one gave his note for his proportionate share of the indebtedness. The note of each maker was guaranteed by the three other men.

Binkley paid his note. White reduced his note by payments to $1,050. He secured this debt to The Bank by a deed of trust on real property. Wells died leaving a bankrupt estate. The principal of his note was about $2,900. This was settled for $1500, paid as follows: Binkley paid The Bank $500 in cash. Sides gave The Bank his note for $500, guaranteed by White. White gave The Bank his note for $500, guaranteed by Sides. This left, as the sole obligation of the old farming venture remaining in the original form, if not amount, the note of Sides guaranteed by White and Binkley. This note is the basis of the instant action.

The complaint in this action was filed in March, 1933. The separate answers were filed: by Binkley, in October, 1935; by White and Sides, in March, 1936. Much of the time elapsing between the filing of the complaint and the answers was used in negotiations and attempts to settle the controversies between the parties, including the settlement of the obligations arising out of the old farming venture, two of which were liquidated in the manner already mentioned, as well as other obligations of defendant Douglas R. Sides and Thomas M. Sides, his brother, their wives, and of Minnie Hansen. All these negotiations on behalf of the Sides brothers were carried on by Douglas, Thomas residing in Oakland and Cincinnati during this time.

The Sides brothers owned 120 acres of land near Selma, in Fresno County. In 1932 this property was encumbered by a deed of trust securing a principal obligation of $16,000, payable to the Coast Bank, and a second deed of trust securing a note for $6,907.24, payable to The Bank. This second deed of trust contained the recital that it was given:

"Second: As security for the payment of such additional amounts as may be hereafter loaned by the Beneficiary, or its successors, to the Trustor, or any of them, or any successor interest of the Trustor, with interest thereon, and for the payment of any other indebtedness or obligation of the Trustor, or any of them, and for all present or future demands of any kind or nature, which the Beneficiary or its successor may have against the Trustor, or any of them, whether created directly or acquired by assignment: whether absolute or contingent; whether due or not or whether otherwise secured or not, or whether existing at the time of the execution of this instrument, or arising thereafter."

The obligation to the Coast Bank called for substantial periodical payments. These the Sides brothers were not able to make. The Coast Bank offered them a substantial discount for an early cash payment of the loan. Douglas Sides approached the officers of The Bank and asked for assistance to enable him to accept this offer. At the suggestion of an officer of The Bank a plan was developed whereby The Bank would advance sufficient money to purchase the Coast Bank obligation at a discount; that a loan, sufficient to retire the obligations of the Sides brothers, would be obtained from the Land Bank. The Bank purchased the note and deed of trust from the Coast Bank at a discount of $2,900. A loan was secured from the Land Bank in the sum of $13,500, and a Commissioner's loan in the sum of $6,500, with the Selma property as security for these loans. In December, 1934, the $20,000 obtained on these loans, less expenses of $983.50, was paid by the Land Bank to The Bank which executed a reconveyance under the Coast Bank deed of trust and another under its own deed of trust. This latter reconveyance contains the following:

"Know All Men By These Presents:

"Whereas, the indebtedness to be paid secured by the Deed of Trust made, executed and delivered on January 18, 1932,

by Douglas R. Sides and Elsa I. Sides, his wife, and Thomas M. Sides and Ruth C. Sides, his wife and Minnie Hansen, a widow, to Corporation of America, as Trustee for Bank of America National Trust & Savings Association, as Beneficiary, which Deed of Trust was recorded on January 30, 1932, in the office of the County Recorder of County of Fresno, State of California, in Volume 1194 of Official Records, at Page 332 et seq., *has been fully paid;* (Emphasis ours.) . . . ''

The deed of trust to The Bank under which this reconveyance was given contains the following:

''The recitals in any full or partial reconveyance shall be conclusive proof against all persons of the truthfulness thereof.''

Plaintiff, assignee of The Bank, maintains that the only obligations of either of the Sides brothers which were paid with the money received by The Bank from the Land Bank, was the debt originally held by the Coast Bank, and the note of $6,907.24, given by the Sides brothers, their wives, and Minnie Hansen, to The Bank; that the note in suit here of $3,375.45, signed by Douglas R. Sides and guaranteed by White and Binkley, was not secured by the second deed of trust and was neither paid by the money received from the Land Bank nor acknowledged paid by the reconveyance from which we have already quoted.

Defendants maintain that the note of Douglas R. Sides in suit here was secured by the plain and clear terms of the second deed of trust to The Bank which we have quoted; that because it was so secured it is included in the recital of the reconveyance that all debts of Thomas M. and Douglas R. Sides and others have been paid; that because of the provision in the deed of trust which made the recitals of the reconveyance ''conclusive proof against all persons of the truthfulness thereof'', neither The Bank nor its assignee for collection, the plaintiff, can be allowed to contradict the clear provisions of the reconveyance that the note of Douglas R. Sides in question here has been paid.

Defendants also rely upon an alleged agreement with The Bank, whereby the money received by The Bank from the Land Bank would be in full payment to The Bank of all in-

debtedness, whether secured or not, of any member of the Sides family.

The evidence on this last contention is hopelessly conflicting. Under the time-honored rule that conflicts in evidence are addressed to the jury and are settled by its verdict we will largely confine our statement of the facts to such of the evidence as tends to support the implied finding of the jury that the note in question here has been paid. If there is substantial material evidence in the record supporting that finding the judgment must be affirmed, unless there were prejudicial errors of law occurring during the trial.

In approaching the evidence on this question, it should be observed that C. W. Christensen, an executive officer of The Bank, was manager of The Bank's branch in Selma. He was also such officer or agent of the Corporation of America, the trustee named in the deed of trust to The Bank, that he executed and acknowledged the reconveyance of the incumbered property. At the same time he was secretary-treasurer of the Selma-Del Rey National Farm Loan Association, acting under the Land Bank. All applications for loans to that bank originating in the Selma-Del Rey District had to go through his office.

Christensen had been a banker in Selma for a number of years. He had been president of a local bank which was taken over by The Bank and operated as its Selma branch. He had been the personal banker of defendants. Many of the conferences concerning the settlement of the Sides brothers' financial difficulties were had with him or in his presence in the Selma Branch Bank and he had personal knowledge of many of the transactions heretofore and hereafter outlined. His official position was such as to charge The Bank and the Corporation of America with notice and knowledge of the facts concerning the transactions in question which came into his possession. Just what authority he had from the Land Bank does not appear. It would seem, however, that he held a position involving such a relationship of confidence that he should have disclosed to that bank any information he had which would materially affect its loan to Thomas M. Sides.

Douglas R. Sides took his financial difficulties involved here to Christensen late in 1932 or early in 1933. Christensen advised him to apply to the Land Bank for a loan. The first

application was made out in March, 1933, and was left with Christensen. It was not sent to the Land Bank because that institution was not then making loans. A second application was made out a few months later. These applications were signed by Douglas R. Sides individually, and Thomas M. Sides, by Douglas R. Sides, his attorney in fact. The second application was also left with Christensen and remained with him. A third application to the Land Bank for a loan was dated December 5, 1933. It was signed by Thomas M. Sides and stated that he was the owner of the Selma property. About that time Douglas R. Sides was appointed appraiser for the Land Bank. Being such appraiser he could not obtain a loan from the Land Bank. To obviate this situation he and his wife, by a deed dated February 5, 1934, and recorded the next day, conveyed his half interest in the Selma property to his brother Thomas M. Sides. Christensen had knowledge of this transaction and the reasons for it. By a deed dated February 7, 1934, and acknowledged on the same day, Thomas M. Sides and wife conveyed an undivided one-half interest in the Selma property to Douglas R. Sides. This deed was immediately placed in the possession of Elsa I. Sides, wife of Douglas. It was not formally delivered to Douglas until in March, 1936, and about that time was recorded. The third application for the loan bears a stamp showing it was received by the appraisal committee of the Land Bank on March 10, 1934. It bears the certificate, dated December 9, 1933, of the loan committee of the Selma-Del Rey National Farm Association appraising the Selma property at $33,050 and recommending a Land Bank loan of not to exceed $15,000. Following this, in the application, is a certificate dated December 20, 1933, signed by C. W. Christensen certifying that the loan had been approved by the favorable vote of the board of directors. The loans of $13,500 by the Land Bank, and of $6,500 by the commissioner, were approved, either on March 20, or August 7, 1934, and were made on the strength of this application. The $19,016.50 was paid to The Bank by the Land Bank in December, 1934.

The Bank was required to and did execute the following "scale down" agreement:

"The Federal Land Bank of Berkeley and/or the Bank Commissioner, having agreed to make a loan to Thos. M. Sides

on certain conditions, which conditions are made a part of this agreement and among which is the condition that the applicant's total obligations, both secured and unsecured, shall not exceed the amount of Twenty Thousand & no/100 Dollars (20,000) when said loan is completed;

"Now, Therefore, the undersigned creditor of said applicant hereby agrees that it will accept the sum of $20,000.00 less loan expense of $983.50 in full satisfaction of the existing obligation of $21,725.86 now due it from said applicant and will execute a full and unconditional release of said obligation upon the payment of the sum herein agreed to be accepted, payment to be made in Federal Farm Mortgage Corporation bonds."

It was stipulated at the trial that the instructions of the Land Bank to the title company handling this escrow were that no money should be paid to The Bank until the Selma real estate was free and clear of all encumbrances.

Three dates are particularly important. (1) The "scale down" agreement was received by the Land Bank on September 27, 1934. (2) The reconveyance by the Corporation of America, reciting that all indebtedness of Douglas R. Sides and wife, Thomas M. Sides and wife and Minnie Hansen, trustors, to The Bank, secured by the second deed of trust, had been fully paid, was dated and acknowledged on November 26, 1934. (3) Under date of September 12, 1934, Douglas R. Sides executed a new note to The Bank in the principal sum of $2,695.86.

Officers of The Bank testified that the note for $2,695.86 represented the difference between the $19,016.50, received from the Land Bank by The Bank, and the total of the Coast Bank loan, less the discount, and the loan by The Bank of $6,907.24, plus accrued interest. Douglas R. Sides testified that this note for $2,695.86 was also paid with the money received by The Bank from the Land Bank under his agreement with the former to cancel all of the Sides family indebtedness in this transaction.

In considering this new note it should be observed that, as between the parties, the conveyance by Douglas R. Sides of his half interest in the Selma property to Thomas M. Sides was simply for the purpose of placing the record title of the property in Thomas M. Sides so that the loan from the Land Bank could be obtained and would not be defeated by the

fact that Douglas R. Sides was at the same time a part owner of the property and an appraiser for the Land Bank. Apparently the real truth of this transaction was not communicated to the Land Bank though it was known to an officer of The Bank and of the Corporation of America, which officer was also an agent for the Land Bank.

If the quoted paragraph of the second deed of trust be given the clear meaning of the language there used, this new note became an obligation secured by this deed of trust. If the reconveyance be given the meaning its words imply, then it recited that this note had been paid. We gather from the record that the Land Bank intended to make the loan only upon the condition that the owner, or owners, of the Selma property had no secured or unsecured obligations totaling more than $20,000, the amount of its loan. Douglas R. Sides, by his deed, intended to convey to his brother only the bare legal title to this property. Unless we conclude that all debts of the Sides family were paid by the payment from the Land Bank to The Bank this intent was violated. As far as we can determine the agent of the Land Bank who had knowledge, either actual or implied, of all these facts did not communicate any of them to the Land Bank. His other principal, The Bank, received the money from this loan. Plaintiff's argument that this new note, dated September 12, 1934, was proof that The Bank did not agree to accept the $19,016.50 from the Land Bank in payment of all the indebtedness of the Sides family, requires a careful scrutiny in the face of these facts. The same may be said of the renewals of the $500 note given by Douglas R. Sides in payment of his part of the Wells indebtedness. In any event this evidence of these new notes, regardless of its weight, merely creates another conflict in the evidence which the jury resolved against plaintiff.

Douglas R. Sides testified that all his indebtedness to The Bank was paid; that a vice president of The Bank told him "they would take $18,000 . . . for my indebtedness"; that the larger loan was finally secured and the money paid to The Bank in full payment of all this indebtedness.

R. W. Binkley also interviewed officers of The Bank on the matter of the payment of the note in suit here of which he was guarantor. He detailed one of these conversations, as follows:

"Q. Will you give us the conversation as near as you can recall? A. Well, this was in November, on a Friday before the Stanford-California game, and I simply dropped in. I was up at the Stanford-California game, and I said, 'I would like to find out where we stand on this Sides note.' Q. That is, the note that is here in question and the one that is being sued on? A. Yes. And Mr. Wente said, 'We have not worked this thing through yet.' He said, 'The first appraisal of Mr. Sides property, the Federal Land Bank only offered $16,000, and' he says, 'that is not enough to pay off his indebtedness, and,' he said, 'we have asked for a new appraisal on it, in the hopes of getting more.' And Mr. Robinson, who was sitting to my left at the desk, was there at the time, and I said, 'How much will it take to pay off all his obligations?' And he said, 'It will take plenty.' I said, 'How much will it take? Give him a discount on the thing, and how much would you have to get from the Federal to square up?' And he said, '18,000.' I said, 'You mean that for $18,000 you will square up all the indebtedness of the entire Sides family?' . . . He said, 'Yes, by blank, we will take $18,000 for the whole blankety, blank business and be glad to get rid of it.' He said, 'We are fed up on Sides; they have been only grief to us and' he says, 'If you or the Federal Land Bank or anybody else will give us $18,000 we will be glad to wipe out the whole slate of all that the Sides family owes us.' And then he facetiously said to me, 'Doctor, there is a good chance for you to make some money; if you will give us $18,000 we will sign over everything that the Sides family owes; we will sign it over for its full face value, and then you can go collect all you can out of the Sides family.' I said, 'Well, I wish I had $18,000 because I feel he has got one of the best ranches in the community, and I think I could make something on it, but if I had $18,000 I wouldn't be up here about this.' . . . Q. Is that all the conversation, Doctor, at that time? A. I remember the way it ended. I was just trying to think; when the interruption came, it disturbed my train of thought. Then I said to Robinson definitely then, as I was ready to go, I said, 'Then I am at liberty to go home and tell Sides if he can get a loan of $18,000 that you will square him up?' And he said, 'Yes.' I says, 'Well, that is fine. If they got an appraisal of $16,000 last time we certainly ought to—they are getting more generous—we ought to get

$17,000 on it, and if we can't get $18,000, I think between White, Sides and myself we ought to be able to raise the extra thousand to add to it and square him up.' He says, 'I don't care where the money comes from. Just so long as we get $18,000, we will square the thing up. Because with the turn over that is present in the bank we can make more on the $18,000 than we can trying to get all these thousand dollars out of Sides for the next 25 years. I said, 'I will go back and tell Sides,' and with that, I left the Bank of America and then went back to Selma and informed Sides.'' He also testified concerning another conversation, as follows: ''I ran across the street from the drug store into the bank and called Mr. Christensen there to the counter, in the front of the bank and I said, 'Is it true you people are going to transfer that property of Doug's over to Tom and leave me unprotected?' He says, 'Yes, it is the only way we can get the federal loan. We had to get that federal loan through to pay this thing off.' I said, 'That is not fair to me, Mr. Christensen, to take away the only security I have and give it to somebody else, because—'I said about the same thing to him, I said, 'Doug Sides could go through bankruptcy and leave me to pay this note then.' He said, 'If we get the federal loan through, the note will be paid and you won't have to pay it.' ''

Concerning the note in question being secured by the second deed of trust given by the Sides family to The Bank, Binkley testified as follows:

''And then later, when Mr. Christensen asked me to sign the Sides note, this one in question, I told him something of the same nature, I don't remember the words, but if I was stuck I wanted to know it now instead of later. 'And Mr. Sides is not getting in any better shape, but getting in worse shape, and I want to know where I stand before I put my name on it.' I said, 'If you take a crop mortgage on his chattels, like sweat boxes and plows and tractors and things that will guarantee this—' He said, 'We already have a trust deed which guarantees it.' I said, 'When did you get the trust deed to guarantee it?' He said, 'We took one last January.' I said, 'How does the trust deed of last January guarantee something that we are signing in August?' He says, 'Well, our trust deeds are worded in such a way that it not only covers the indebtedness at the time they are given, but they cover any future indebtedness incurred by the debtor

during the lifetime of the trust deed.' And I said, 'May I see that trust deed?' He said he did not have it at hand but he had had a form that they were made on, which he could present to me to show it would cover these things; and one of the assistants then gave me a form which I took back to my office to read over. It was—to study, and it did include these things, the way it was.''

It is our opinion that the foregoing evidence furnishes some substantial and material evidence supporting the following conclusions which in turn support the verdict and judgment:

(1) That the note in suit here was secured by the second deed of trust dated January 18, 1932, given by the Sides family to The Bank.

(2) That the recital in the reconveyance of the property described in this deed of trust, to the effect that all indebtedness of the Sides family secured by it had been paid, included payment of the note in suit here.

(3) That by the terms of the deed of trust, the recitals of the reconveyance, including the recital of payment, were made ''conclusive proof against all persons of the truthfulness thereof''.

(4) That in addition to this documentary evidence, the testimony of Douglas R. Sides and R. W. Binkley constitutes some additional material and substantial evidence supporting the implied finding of the jury that the note in suit here had been paid.

 Plaintiff seeks to escape the conclusion that there was a contract to pay the indebtedness of the Sides family, amounting to about $27,000, all of which was past due, with the payment of $19,016.50 received by The Bank from the Land Bank by contending that such agreement, if made, was void because not supported by any consideration. This precise contention was made and held unsound in two cases recently decided. In *Wagner* v. *Shoemaker*, 29 Cal. App. (2d) 654 [85 Pac. (2d) 229], it was said:

''Shoemaker maintains and contends that the contract of September 8, 1935, merely reduced the amount to be paid on a past due obligation and extended the time of payment; that it is not supported by any consideration and is void. The same argument was made in the case of *Brooks* v. *Fidelity Savings & Loan Assn.*, 26 Cal. App. (2d) 114 [78 Pac. (2d) 1175] (hearing denied), which involved a contract to accept

$10,000 in payment of a $15,000 obligation upon which there was an unpaid principal balance of $11,118.56. There, as here, the owners agreed to apply for a new loan on the property. In holding this contract was supported by a sufficient consideration, the court said:

" 'Weighing all of the conditions then existing,—a depressed market for real property, the value of ready cash, the scarcity of bidders at foreclosure sales due to financial conditions which then existed in the general business depression, defendants may have preferred an agreement for the payment of $10,000.00 in cash rather than to take over real property on foreclosure.

" 'It is also alleged that plaintiffs expended money and time in procuring the consent of the Reconstruction Finance Corporation to advance the money, something plaintiffs were not called upon to do by the terms of their note.

" 'We believe that sufficient consideration did exist for the execution of the agreement, and on that issue the complaint stated a cause of action.' "

■ Plaintiff urges that if the note in question ever was secured by the deed of trust to The Bank, the security was waived by The Bank, and at all times material here it was an unsecured obligation and was not included within the recital of payment contained in the reconveyance. This argument is based largely on a provision of the deed of trust, and on sections 3268 and 3513 of the Civil Code, and such cases as *Miller & Lux, Inc.*, v. *San Joaquin Light & Power Corp.*, 120 Cal. App. 589 [8 Pac. (2d) 560].

The deed of trust contains the following:

"The beneficiary may bring an action to enforce the payment of said promissory note or notes and/or all indebtedness secured hereby without causing the Trustee to sell said property as herein provided; it being understood that all rights and remedies allowed the Beneficiary, or the Trustee, under the law and this instrument, and the note or notes secured hereby, shall be concurrent and cumulative. The trustor hereby waives the provisions of Section 726 of the Code of Civil Procedure of the State of California."

Section 3268 of the Civil Code provides as follows:

"Except where it is otherwise declared, the provisions of the foregoing fifteen titles of this part, in respect to the rights and obligations of parties to contracts, are subordinate to the

intention of the parties, when ascertained in the manner prescribed by the chapter on interpretation of contracts; and the benefit thereof may be waived by any party entitled thereto, unless such waiver would be against public policy."

Section 3513 of the Civil Code provides as follows:

"Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

In *Miller & Lux, Inc.*, v. *San Joaquin Light & Power Corp.*, *supra*, it was held that, generally speaking, a party may waive the benefits of a contract which run to him.

The question of a mortgagee's right to waive the security and sue on the note without first foreclosing is an interesting one that does not seem to have been decided in California. There is argument, assumption or *dicta* which might be construed as tending to support the right to waive the security and sue without foreclosure in the following cases: *Martin* v. *Becker,* 169 Cal. 301 [146 Pac. 665, Ann. Cas. 1916D, 171], *Western Fuel Co.* v. *Sanford G. Lewald Co.,* 190 Cal. 25 [210 Pac. 419], *Murphy* v. *Hellman etc. Bank,* 43 Cal. App. 579 [185 Pac. 485], and *Bank of Italy Nat. T. & S. Assn.* v. *Bentley,* 217 Cal. 644 [20 Pac. (2d) 940].

In *Martin* v. *Becker, supra, Western Fuel Co.* v. *S. G. Lewald Co., supra,* and *Murphy* v. *Hellman etc. Bank, supra,* it is stated that section 726 of the Code of Civil Procedure was enacted for the benefit of the mortgagor and in each case it is stated that it did not appear that the mortgagor had waived the benefit of that section. In *Bank of Italy* v. *Bentley, supra,* it is stated that the deed of trust there involved did not give to the beneficiary the right to sue before exhausting the security, and further, that the beneficiary had neither expressly nor impliedly waived its security before suing on the note. It is obvious that those cases do not answer the question of waiver which is before us here. The statements in the first three of those cases are merely of the fact that the security had not been waived and no attempt was made to determine rights of the parties where a waiver might have been attempted. In the Bank of Italy case the statement that the deed of trust did not provide for a waiver of any of its provisions or that a waiver had neither been alleged nor proved is not a holding that such a waiver in the

document, or such a waiver pleaded and proved, is a legal and binding waiver of an existing right.

We are not seriously impressed with the argument of waiver for four separate reasons which we must separately consider.

*First:* Assuming the waiver provision of the deed of trust valid, The Bank could not take the inconsistent position of having waived the security for one note and having retained it for another note where the same property was given as security in one deed of trust for all of the notes.

Plaintiff urges that the waiver of the security was made only as to the note in question here and not as to the secured note for $6,907.24. He claims that the security for the note of $6,907.24 was not waived. The same security was given to secure all of the notes in a single deed of trust.

There is no provision in the deed of trust permitting suit before foreclosure on one of the secured notes while retaining the security for other secured notes. The contract attempts to waive the provisions of section 726 of the Code of Civil Procedure. If such a provision be valid it authorized a waiver of all of the security which was given for all of the secured notes. It did not permit the security to be held for one purpose and abandoned for another. If valid, a waiver of security on one of the notes was a waiver of all the security. The Bank could not waive the security for one note and retain the same security for another note where the security for all notes was the same property and the lien was created in a single instrument.

In *Jones* v. *Maria,* 48 Cal. App. 171 [191 Pac. 943], it was said:

"Waiver is the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right—an election by one to forego some advantage he could have taken or insisted upon. A person who is in a position to assert a right or insist upon an advantage may, by his words or conduct, and without reference to any act or conduct of the other party affected thereby, waive such right. Once such right is waived, it is gone forever; the person who has waived the right will thereafter be precluded from asserting it."

The Bank asserted it held the Selma property as security for the $6,907.24 note after the purported waiver of the security for the note in suit here. Its claim of waiver is not

convincing under evidence of its own conduct which shows it claimed security for one secured note after the purported waiver of that security for payment of another secured note. A waiver of security must be a waiver of the security,—that is, of all security.

■ *Second:* The provision in the deed of trust waiving the benefits of section 726 of the Code of Civil Procedure is inconsistent with the purposes of the entire instrument and attempts to destroy its legal effect as a deed of trust.

The law has been zealous in protecting the legal rights of the borrower who gives security for his debt. He cannot give a deed to real estate or a bill of sale of personal property and agree in advance that if his debt is not paid when due, title to the security shall vest in his creditor. Such a contract is void and the creditor must resort to foreclosure proceedings to divest the debtor of his title. (See 17 Cal. Jur., p. 735 et seq., and cases cited.)

The debtor cannot in advance waive his right of redemption, for such a contract is void under the maxim that "what is once a mortgage is always a mortgage". In *Bradbury* v. *Davenport,* 114 Cal. 593 [46 Pac. 1062, 55 Am. St. Rep. 92], the Supreme Court said:

"Aside from the provision of said section of the Civil Code, it is well settled that the mortgagor is not allowed to renounce beforehand his privilege of redemption; that while generally anyone may renounce any privilege or surrender any right he had, that an exception is made in favor of debtors who have mortgaged their property, for the reason that their necessities often drive them to make ruinous concessions; that when one borrows money upon security of his property, he is not allowed by any form of words to preclude himself from redeeming (Jones on Mortgages, secs. 251, 1045), though the doctrine 'once a mortgage, always a mortgage' does not apply to subsequent contracts. (*Watson* v. *Edwards,* 105 Cal. 70, 75 [38 Pac. 527, 528].)"

In *Blodgett* v. *Rheinschild,* 56 Cal. App. 728, at 737 [206 Pac. 674], it was said:

"Turning now to a consideration of certain contracts which the law forbids a mortgagee to make with his mortgagor: It is an established doctrine that 'what is once a mortgage is always a mortgage'—which means that no agreement in advance to waive the equity of redemption is valid, and that

when once it is established that a transaction is impressed with the character of a mortgage the right to redeem will continue until the debt is paid or until the equity of redemption is foreclosed or barred, or duly and sufficiently released. (Civ. Code, sec. 2889: *Bradbury* v. *Davenport,* 114 Cal. 593 [46 Pac. 1062, 55 Am. St. Rep. 92].) For the same reason it is not competent for the parties to make a conveyance of property, absolute in form, a security for the payment of money by a given day, with the further agreement that if payment is not made the instrument shall be treated as an absolute sale. If the instrument is a mortgage when delivered, it will so continue until the right of redemption is cut off in some of the modes recognized by law. (*Bearss* v. *Ford,* 108 Ill. 16, 26; 27 Cyc. 975.)''

We can see no distinction between the illegality of a contract that in advance waives foreclosure and vests title to the security in the creditor on default in the case of a deed given as a mortgage or in the illegality of a contract that in advance attempts to waive the equity of redemption, both of which are void, and the illegality of the instant contract that attempts to waive all of the provisions of the deed of trust and destroy its legal effect as a security.

■ *Third:* We regard the portions of the deed of trust we are now considering as contrary to the policy of the California law.

What we have already said and the authorities just cited bear on this question and show that the policy of the California law prohibits the mortgagor and mortgagee from entering into certain contracts attempting in advance to waive the statutory provisions incident to formal foreclosure proceedings. Such contracts are void as violating public policy. There is no distinction to be made between a mortgage and a deed of trust. (*Bank of Italy Nat. T. & S. Assn.* v. *Bentley, supra.*)

■ California has enacted an exact system and a definite procedure for foreclosure of mortgages and deeds of trust. These laws in effect at the time of the execution of the mortgage or deed of trust enter into and become a part of such contracts. (*Fuxon* v. *All Persons,* 166 Cal. 707 [137 Pac. 919, L. R. A. 1916B, 1209]; *Brown* v. *Ferdon,* 5 Cal. (2d) 226 [54 Pac. (2d) 712]; *Birkhofer* v. *Krumm,* 27 Cal. App. (2d) 513 [81 Pac. (2d) 609].) It is now thoroughly settled

here that, generally speaking, this orderly procedure prescribed by our statutes requires the foreclosure, either by suit or trustee's sale, of deeds of trust before suit can be brought on the secured note (*Bank of Italy* v. *Bentley, supra; Birkhofer* v. *Krumm,* 4 Cal. App. (2d) 43 [40 Pac. (2d) 553]) and then only for the balance remaining after security is exhausted. The property given as security furnishes the primary fund for the payment of the debt and this fund must be exhausted before recourse can be had to the maker of the note. (*Birkhofer* v. *Krumm, supra.*)

The various reasons for adopting this policy of the law are set forth in several cases.

In *Ould* v. *Stoddard,* 54 Cal. 613, the Supreme Court said:

"It is not difficult to discover the policy which dictated the enactment of this statute. The tendency of modern legislation is to prevent a multiplicity of suits, and no one doubts the wisdom of it."

The evils sought to be corrected by our foreclosure statutes are amplified in *Toby* v. *Oregon Pac. R. R. Co.,* 98 Cal. 490 [33 Pac. 550], as follows:

"A glance at the law as it existed prior to the adoption of our statutes in relation to mortgages will tend to make manifest the evils sought to be obviated by those enactments. At common law a mortgage was regarded as a conveyance upon condition to become absolute upon non-performance of the condition. Upon such non-performance the courts of law held the estate to be vested in the mortgagee, and refused to recognize the right of redemption. They conceded the jurisdiction of courts of equity to grant relief from the forfeiture; but that was the extent of the mitigation permitted until the passage of the Judicature Act of 36 and 37 Vict., chapter 66, sections 24 and 25, which provide that when the rules of law and equity are in conflict, those of equity shall prevail in all the courts. In the United States there has been no uniform doctrine in respect to mortgages. A majority of the states adopted the English doctrine. In Delaware, Mississippi, and Missouri, the doctrine is that before default the title remains in the mortgagor, but passes to the mortgagee upon his taking possession after default, subject to be defeated upon payment of the debt. Another hardship upon the mortgagor needed a remedy. The mortgagee could bring an action at law to recover the mortgage debt, and although he

obtained judgment and (where permitted so to do by law) imprisoned the mortgagor, it did not without payment impair his mortgage.

"The first of the hardships indicated was remedied by section 744 of our Code of Civil Procedure, which provides that 'a mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the property without a foreclosure and sale'.

"The right to a personal action to recover a debt secured by mortgage is inhibited by section 726 of the Code of Civil Procedure, hereinbefore quoted. Under that section there can be but one action for the recovery of any debt, etc., which must be in accordance with the provisions of that chapter. It further provides that a personal judgment may be entered for a balance remaining due, if the proceeds of the encumbered property shall be insufficient, etc. To confine a recovery in such classes to one action; to make the mortgaged property the primary fund out of which satisfaction is to be had, and to give the plaintiff a personal judgment for such balance as may remain due after the exhaustion of the mortgaged property, are the three essential things provided for."

In *Felton* v. *West*, 102 Cal. 266 [36 Pac. 676], it was said: "Formerly the law allowed an action upon a promissory note, and also a suit in equity to foreclose the mortgage given to secure the note. The mischief in such a practice lay in the multiplicity of suits, and the harassing of the debtor by two actions, when the creditor could readily enforce all his rights in one. A remedy for this evil was provided by section 726 of the code, whereby the creditor was allowed to foreclose his mortgage and have a personal judgment for any deficiency in the same action. This court has construed this law so as to suppress the mischief and advance the remedy by compelling the creditor to exhaust his security before proceeding personally against the debtor."

The following appears in *Commercial Bank* v. *Kershner*, 120 Cal. 495 [52 Pac. 848] :

"Appellant asks, Why not allow a personal action as well before as after the mortgage security has been exhausted? The simple answer is found in the statute and in its reason and policy, which are to prevent multiplicity of suits and the attendant annoyance and additional cost of the debtor."

The underlying reason and background for the remedial legislation in favor of mortgage and deed of trust debtors was thus stated by one of the judges in the case of *Samuel* v. *Jarrah Timber & Wood Paving Corp.* (1904), A. C. (Eng.) 323, 6 B. R. C. 386:

"This court, as a court of conscience, is very jealous of persons taking securities for a loan and converting such securities into purchases. And therefore I take it to be an established rule that a mortgagee can never provide, at the time of making the loan, for any event or condition on which the equity of redemption shall be discharged and the conveyance absolute. And there are great reason and justice in this rule, for necessitous men are not, truly speaking, freemen, but, to answer a present exigency, will submit to any terms that the crafty may impose upon them."

How the courts should ascertain what is the public policy of the state is discussed in *Southern Pac. R. Co.* v. *Stibbens*, 103 Cal. App. 664, where, at page 678 [285 Pac. 374], it is said:

"What is, or what is not, against public policy is a question upon which the courts in various jurisdictions do not always agree. 'Some courts, speaking upon this subject, have said that the immediate representatives of the people, in legislature assembled, would seem to be the fairest exponents of what public policy requires, as being most familiar with the habits and fashions of the day, and with the actual condition of commerce and trade, their consequent wants and weaknesses, and what legislation is least objectionable, because it operates prospectively, as a guide in future negotiations, and does not, like a judgment of the court, annul a contract already concluded. There can be no doubt that primarily it is the prerogative of the legislature to declare what contracts and acts are contrary to public policy, and to forbid them; hence public policy is what a statute enacts. Therefore it is the duty of the judiciary to refuse to sustain that which is against the public policy of the state, when such public policy is manifested by the legislation or fundamental law of the state. Nor can courts declare contracts or acts authorized by statute to be contrary to public policy; but in the absence of a statute they may declare void, as against public policy, contracts which are clearly injurious to the interests of the public.' (6 R. C. L., p. 709.) This rule seems to have been

adopted in California in the case of *Lux* v. *Haggin,* 69 Cal. 255 [4 Pac. 919, 10 Pac. 674, 702], in which it was held as follows: 'The policy of the state is not created by the judicial department although the judicial department may be called upon at times to declare it; it can be ascertained only by reference to the Constitution and laws passed under it, or, which is the same thing, to the principles underlying and recognized by the Constitution and laws.' The recent case of *Maryland Cas. Co.* v. *Fidelity & Cas. Co.,* 71 Cal. App. 492 [236 Pac. 210, 212], has enlarged upon but not departed from this rule. In this case the court said: 'An exact definition of public policy would be difficult to formulate. One that has been frequently approved is that adopted by Lord Brougham, namely, that no one can lawfully do anything which has a tendency to be injurious to public welfare.' " (See, also, *Hiroshima* v. *Bank of Italy,* 78 Cal. App. 362 [248 Pac. 947], and *Carr* v. *Kingsbury,* 111 Cal. App. 165 [295 Pac. 586].)

■ Legislation affecting and intended to benefit a large class of the inhabitants of the state is legislation affecting the public welfare of the state. (*In re Kazas,* 22 Cal. App. (2d) 161 [70 Pac. (2d) 962].) It cannot be doubted that the debtor class in California constitutes a substantial portion of the state's population. As indicated in the cases already cited, our statutes require creditors to follow the statutes in foreclosures of mortgages and deeds of trust for the various reasons given in those cases. As those statutes were passed to promote the public welfare by protection of the debtor class from oppression, they must be construed as declaring a public policy of the state and they cannot be waived by contract. (Secs. 3268 and 3513, Civ. Code.)

While only statutes in effect at the time a deed of trust is executed become a part of and regulate the foreclosure of that instrument, in determining the question of what is the public policy of the state concerning the enforcement of these laws, we cannot be entirely unconscious of the effect of our decision on amendments to these laws and new statutes passed which bear upon and amplify that public policy.

In 1933 the legislature passed further laws for the purpose of relieving mortgage and trust deed debtors. Among them are sections 580a, 580b, and an amendment to section 726 of the Code of Civil Procedure.

Section 580a was intended to limit the amount of any deficiency judgment to the difference between the unpaid principal and accrued interest of the debt, plus costs and attorney's fees, when allowed, and the actual value of the security at the time of sale to be determined by appraisement. It is obvious that if the creditor could be permitted to waive the security and sue on the note, the effect of this section could be entirely nullified.

Section 580b of the Code of Civil Procedure prohibits a deficiency judgment where a mortgage or deed of trust is given to secure the unpaid portion of the purchase price of real property. If the creditor be permitted to waive his security and sue on his note he could obtain a personal judgment for the entire unpaid portion of the purchase price which is contrary to the clear intent of the section.

The amendment to section 726 of the Code of Civil Procedure sought to further insure to the debtors the protection afforded them by the two sections just considered.

 *Fourth:* A guarantor should not be deprived of the security given for the principal debt without his consent when the creditor still seeks to hold him to his contract.

"The guarantor of an obligation is entitled to certain rights of subrogation as against the principal debtor. He may enforce any remedy which the creditor has against the principal debtor." (13 Cal. Jur. 121.) A guarantor is entitled to be reimbursed by receiving the benefit of any security the creditor held against the debtor. (*Clark* v. *Chapman,* 98 Cal. 110 [32 Pac. 812, 33 Pac. 750].) The creditor should not be permitted to urge a secret waiver of the security for the principal debt and still attempt to hold the guarantor to the entire obligation of his contract.

Plaintiff seeks to escape the effect of our last conclusion by urging that the security was without value to the guarantors as the secured debts of the Sides brothers exceeded the value of the security.

A sufficient answer to this argument is that the evidence of the value of the security is conflicting. The jury could have concluded that the value of the security exceeded the total indebtedness by several thousand dollars.

Douglas R. Sides testified that the total indebtedness was twenty-seven or twenty-eight thousand dollars. As there is no evidence of the exact amount of this indebtedness we will

assume the correctness of the first figure. This should be reduced by the twenty-nine hundred dollar discount given by the Coast Bank. It is admitted that the Sides brothers should have had and did actually receive the benefit of this discount.

Two witnesses for plaintiff testified that the security was worth $24,000. Opposed to this is the testimony of Douglas R. Sides that the property was worth $36,000. Plaintiff urges that this testimony was incompetent and should not be considered as Douglas R. Sides was not an owner of the property between February 6, 1934, and March, 1936.

When this evidence was given by Sides it had not been developed that he had deeded his interest in the property to his brother. Under that state of the record, as he then appeared to be an owner, he was a competent witness as to value. No motion to strike his evidence of value was made. That evidence remained in the record for consideration. By the foregoing statements we do not wish to be understood as intimating that Douglas R. Sides ever divested himself of all his interest in the property or that he was not an equitable if not a legal owner during the time his brother held the record title.

In addition to the testimony of Douglas R. Sides as to the value of the property there is in evidence the application to the Land Bank for the loan in which the property was appraised at $33,050. This exhibit was introduced by plaintiff and, as we have observed, bears a certificate signed by C. W. Christensen, an officer of The Bank, and at the same time an agent of the Land Bank. It was sent to the Land Bank by Christensen for the purpose of getting the Land Bank to lend $20,000 on the property in question. There is undisputed evidence in the record that the Land Bank would not have loaned in excess of $18,000 on property only worth $24,-000. As the totals of the loans through the Land Bank obtained under this application amounted to $20,000 it is evident that reliance was placed on the $33,050 appraisement in the application. The Bank received all of the money obtained on this loan, less the cost of making it. Under these circumstances this appraisement produced and introduced in evidence by plaintiff should not be lightly brushed aside.

■ Plaintiff urges that the trial judge committed prejudicial error in refusing him the right to introduce evidence

showing that The Bank had always carried the note in suit here in its unsecured files and had regarded and treated it as unsecured. We find that this fact and the attitude of The Bank and its officers concerning this note was fully brought out in the cross-examination of Dominic Bianco, an officer of The Bank and a witness for plaintiff. This evidence was not contradicted. The excluded evidence was merely cumulative. As the facts which plaintiff desired to establish by the excluded evidence were all proved by the witness Bianco and were before the jury without contradiction, we cannot regard the error in the questioned rulings, if any, as prejudicial.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 8, 1939.