[L. A. No. 25335. In Bank. May 1, 1959.]

JENNIE HAMUD et al., Plaintiffs and Appellants v. E. T. HAWTHORNE et al., Defendants and Appellants.

Curtis L. Gemmil for Plaintiffs and Appellants.

George C. Gillette, Herbert Gall, John U. Gall and Edward Fitzpatrick for Defendants and Appellants.

SCHAUER, J.—Defendants appeal from a judgment for plaintiffs in this suit to have a quitclaim deed declared to be a mortgage; for surrender and cancellation of a note, third deed of trust, and the quitclaim deed; for "Redemption . . . and for Reconveyance" of the property covered by the deed; and for an accounting. Defendants appeal also from an ex parte order of June 12, 1957, entered subsequent to the judgment, authorizing plaintiffs to deposit with the court clerk a certain sum of money for the benefit of defendants, as a condition of redeeming the property. Plaintiffs appeal from the portion of the main judgment allowing defendants reimbursement for property upkeep expenses, and for sums paid as principal and interest on first and second deeds of trust and for taxes and sewer bonds. We have concluded that the record establishes that plaintiffs were guilty of laches in asserting their claims to the property, and that the judgment should therefore be reversed.

On January 25, 1951, plaintiffs and defendant Hawthorne entered into a contract in the form of escrow instructions. Thereby Hawthorne agreed to loan plaintiffs $3,500, and plaintiffs agreed to deliver into the escrow a promissory note to Hawthorne, dated January 25, 1951, for $3,850, payable in full on May 1, 1951, without interest, and a third deed of trust securing the note on property, consisting of three rental units, owned by plaintiff Mrs. Hamud. The escrow instructions recited that there then existed against the property a first deed of trust in the approximate amount of $6,200, a second deed of trust in the approximate amount of $2,000, and a bond of record in the approximate amount of $195, a total of $8,395.

The escrow instructions contained the following provisions, among others:

"It is agreed between the parties hereto that the above third trust deed shall be recorded on the property described above as soon [as] the preliminary title report is received by Hansen Escrow & Mortgage Co. In addition to this third trust deed, the borrowers agree to execute a Quit Claim Deed in favor of the Lender, said Quit Claim Deed to be retained in this escrow file and used only on the following condition: (1) In the event the within described Note for $3850.00 is not paid when due, your company is authorized and instructed to record this Quit Claim Deed at once, and the borrowers herein agree to have no further claim upon this property of any nature or kind whatsoever. (2) In the event the Quit Claim Deed is recorded, any and all rentals due or to become due in the

future shall immediately become the property of E. T. Haw-. thorne as of the date of recordation of said Quit Claim Deed.''

Hawthorne deposited the $3,500 into the escrow. Plaintiffs likewise delivered into the escrow the note, the third deed of trust, and the quitclaim deed, dated January 25, 1951. On January 30, 1951, the third deed of trust was recorded, plaintiffs received the amount of the loan, and Hawthorne received the note. At this time plaintiffs were in default in payments on the first deed of trust and foreclosure was threatened. Payments on the second deed of trust were also delinquent. There was testimony that the value of the property was then about $10,100, and the total encumbrances against it, including the third deed of trust, were about $12,245.

On April 16, 1951, the escrow officer (defendant Hansen) sent plaintiffs a letter reminding that the Hawthorne note would be due on or before May 1, 1951, and stating that if it was not paid the ''property'' would be recorded in the name of Hawthorne. No reply was made to the letter, nor was an extension of time requested. The Hawthorne note was not paid on May 1. On May 4, 1951, the quitclaim deed was recorded at the request of the escrow company. The deed contained this statement over plaintiffs' signatures:

''The purpose of this Quit Claim Deed is to accomplish a mutual agreement between the parties hereto, and upon record-· ation, the grantees[1] release any and all claim of any nature or kind whatsoever to the property described herein or to any rentals which may be due or accrue from the property after the date of recordation.''

On May 4, 1951, the escrow officer again wrote to plaintiffs, this time stating that the quitclaim deed had been recorded and that on May 7, 1951, foreclosure proceedings were to be brought by a savings and loan association which held the first deed of trust. Plaintiffs did not reply. Immediately thereafter Hawthorne took possession of the property with, as found by the trial court, the consent of plaintiffs.

After taking possession Hawthorne paid off the delinquent second deed of trust note of $2,338.88, and paid the delinquencies on the first deed of trust. On May 7, 1951, he conveyed the property to defendant Hansen. On May 29, 1951, Hansen conveyed to defendants Shaffer, who assumed the existing encumbrances, took possession, collected the rents, paid the taxes, water bills and costs of upkeep, and made im-

---

[1]The word ''grantees,'' rather than ''grantors,'' seems an obvious typographical error.

provements to the property during the ensuing nearly five years.

In August, 1951, an action was filed against plaintiffs by Hawthorne's assignee seeking to recover $359.86 as payments assertedly made by Hawthorne on one or more of the prior encumbrances. It was apparently Hawthorne's position that the Hamuds had owed him the duty of protecting his third deed of trust by, among other things, maintaining the payments on the prior encumbrances insofar as such payments accrued prior to May 1, 1951. The Hamuds filed an answer, verified by Mrs. Hamud, which alleged as an affirmative defense "that a settlement was effec[t]uated between the plaintiff's assignor [Hawthorne] and defendants [the Hamuds] wherein the defendants returned to said . . . assignor the property upon which said assignor is now claiming the defendants as owing to him as money paid and expended." Plaintiffs asserted no claims and exercised no rights of any kind as owners of the property after defendants took possession, until October, 1955. In July, 1955, a representative from an oil company had sought to obtain a new deed from Mrs. Hamud to the Shaffers. Mr. Hamud then looked up the quitclaim deed in the County Recorder's office, discovered the erroneous use of the word "grantees" instead of "grantors," and immediately contacted his attorney. In October, 1955, Mr. Hamud stated to Mrs. Shaffer, in a telephone conversation, that plaintiffs had "held out" the mineral rights on the property. This action, however, was not filed until April 30, 1956.

The court found that the quitclaim deed was executed by plaintiffs as additional security for the loan and was intended by both plaintiffs and defendant Hawthorne to be a mortgage only, that defendants Hansen and Shaffer had at all times involved acted as agents of Hawthorne. The ensuing judgment for plaintiffs provided, among other things, that if they paid a certain sum into court for the benefit of defendant Hawthorne within 90 days of the date of judgment (May 29, 1957), plaintiff Jennie Hamud could redeem the property and defendants should forthwith surrender possession. On June 12, 1957, the trial court made an ex parte order authorizing plaintiffs to deposit the specified amount with the clerk of the court.

As the first ground for reversal, defendants urge that the evidence does not support the finding that the quitclaim deed was in fact a mortgage, given as further security, and contend that the evidence establishes as a matter of law that

the deed was delivered only after the debt became due and was legally effective only as an absolute conveyance which cannot now be set aside. This contention is without merit.

At the trial Mr. Hamud testified that before signing the escrow instructions he objected to the idea of the quitclaim deed and asked defendant Hawthorne if it could be eliminated; that Hawthorne "said, no, that was the only way they could make the loan. Take it or leave it," and Hamud "decided to take it." Hawthorne testified to the effect that the purpose of the quitclaim deed was to avoid the necessity of foreclosure in case of default by plaintiffs.

As observed in *Bastajian* v. *Brown* (1943), 57 Cal. App.2d 910, 915 [4] [135 P.2d 374, 137 P.2d 475], "Transfers of mortgaged properties by mortgagors to mortgagees for the purpose of avoiding foreclosure proceedings . . . have not been uncommon occurrences . . . [and] have been held valid by the courts where the transactions were fair and honest . . . (*Baldwin* v. *American Trading Co.* [1925], 76 Cal.App. 80 [243 P. 710]; *Deming* v. *Smith* [1937], 19 Cal.App.2d 683 [66 P.2d 454]; *Watson* v. *Edwards* [1894], 105 Cal. 70 [38 P. 527]; *Phelan* v. *De Martin* [1890], 85 Cal. 365 [24 P. 725]; 18 Cal.Jur. 68 et seq.)" (See also *McDonald* v. *Huff* (1888), 77 Cal. 279 [19 P. 499].) Each of the cited cases, however, involved a situation wherein an original loan contract was first entered into providing for a note secured by a deed of trust or mortgage and, *after* default in payment, the parties entered into a *separate, distinct* and *subsequent* contract which provided for the conveyance of the subject property to the mortgagee or beneficiary, either forthwith or upon default after a further time extension granted in the contract made *subsequent* to default. It was expressly mentioned in the Phelan (p. 368 of 85 Cal.) and the Baldwin (p. 87 of 76 Cal.App.) cases that such transactions did not fall within the prohibitions of section 2889[2] of the Civil Code. (See also Civil Code §§ 2924,[3] 2953.[4])

---

[2]Civ. Code, § 2889: "All contracts for the forfeiture of property subject to a lien, in satisfaction of the obligation secured thereby, and all contracts in restraint of the right of redemption from a lien, are void."

[3]Civ. Code, § 2924: "Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage, except when in the case of personal property it is accompanied by actual change of possession, in which case it is to be deemed a pledge. . . ."

[4]Civ. Code, § 2953: "Any express agreement made or entered into by a borrower at the time of or in connection with the making of or

■ Where as here, however, the agreement purporting to waive or restrain redemption rights is made at the time of the loan, it is invalid. ■ As declared in *Salter* v. *Ulrich* (1943), 22 Cal.2d 263, 267 [2] [138 P.2d 7, 146 A.L.R. 1344], "the right of redemption . . . may not be waived in advance. [Citations, including Civ. Code, § 2889.] However, the mortgagor may subsequently deed the property to the mortgagee or may release or sell the right of redemption. [Citations.]" (See also *Morello* v. *Metzenbaum* (1944), 25 Cal.2d 494, 499 [3] [154 P.2d 670]; *Wakabayashi* v. *Stafford Packing Co.* (1921), 186 Cal. 632, 633 [1] [200 P. 392]; *Winkleman* v. *Sides* (1939), 31 Cal.App.2d 387, 405 [7] [88 P.2d 147].) ■ It follows that those provisions of the escrow instructions here involved by which the plaintiffs purported to agree that after recordation of the quitclaim deed, as authorized upon default by them in payment, they should "have no further claim upon this property of any nature or kind whatsoever," were ineffective to waive plaintiffs' right to redeem the encumbered property.

Defendants contend also that plaintiffs were guilty of laches and are estopped to "maintain this action" and to claim ownership of the subject property. Defendants did not specifically plead estoppel or laches as such, but did plead, and the court found, the facts as to execution of the trust deed, etc., and that "the defendant, E. T. Hawthorne, entered into possession of said premises under and pursuant to the agreement contained in said escrow instructions dated January 25, 1951 and the provisions of the Quit Claim Deed executed, delivered and recorded pursuant to the provisions thereof dated January 25, 1951." ■ The general rule is that laches may not be relied upon where the facts giving rise to such defense do not appear in any of the pleadings (see *Reed* v. *Norman* (1953), 41 Cal.2d 17, 21-22 [6] [256 P.2d 930].; *Phoenix Mutual L. Ins. Co.* v. *Birkelund* (1946), 29 Cal.2d 352, 363 [4] [175 P.2d 5]; *Worthen* v. *Jackson* (1956), 139 Cal.App.2d 615, 618 [5] [293 P.2d 797]. ■ But here plaintiffs' complaint on its face shows delay in commencing suit to recover the property far beyond any period allowed

renewing of any loan secured by a deed of trust, mortgage or other instrument creating a lien on real property, whereby the borrower agrees to waive the rights, or privileges conferred upon him by Sections 2924, 2924b, 2924c of the Civil Code or by Sections 580a or 726 of the Code of Civil Procedure [which include redemption provisions], shall be void and of no effect. . . ."

for redemption after sale under the deed of trust (see Code Civ. Proc., §§ 702, 703, 725a) and the record discloses established facts from which it follows that plaintiffs should not recover.

Here, as in the Birkelund case, plaintiffs' claims are equitable in nature, and it appears from the undisputed evidence that there has been a change in circumstances and in the value of the property. As already stated, plaintiffs surrendered possession to Hawthorne in May, 1951, and in September of that year the plaintiffs, in an answer (verified by Mrs. Hamud) to the action filed against them by Hawthorne's assignee, alleged that as a settlement of Hawthorne's claim for reimbursement of the $359.86 advanced by him in payment of an installment of principal and interest on the first deed of trust and interest due on the second encumbrance, the property had been "returned" to Hawthorne. Although the word "returned" is not exactly synonymous with "conveyed" or "surrendered" it appears in its context, and in the circumstances of the filing of the answer, to have been used in that sense by the Hamuds. This would seem to be tantamount to a reaffirmation of the intent to surrender title evidenced by the quitclaim deed, and at this date the quitclaim could have been validly executed.

Furthermore, relevant to the equities of the matter, the record shows that in January, 1951, Hawthorne had advanced to plaintiffs $3,500 upon property in which it appears that plaintiffs' equity amounted to only some $1,705 (total value of property $10,100, less existing liens totaling $8,395), with payments already in default upon both the first and second trust deeds. After taking possession in reliance upon plaintiffs' consent, Hawthorne paid out an additional $2,338.88 in full discharge of the second deed of trust note, plus the delinquencies of $359 hereinabove mentioned. During the ensuing almost five years before this suit was filed defendants Shaffer paid in addition the sum of $4,970 principal and interest on the first trust deed, water bills of $334.72, taxes and sewer bonds of $1,277.75 and upkeep expenses of $1,350.35. It thus appears that defendants had invested approximately $15,000 in cash in the property, together with their services in operating it, against which the court found that they had collected only $11,719.15 in rents and "profits." Although the court ordered restitution of the property only upon the payment by plaintiffs of the difference between the cash

amounts collected by defendants and those they had paid out over the nearly five year period, defendants had meanwhile borne the burden of managing, maintaining, and operating the property as well as the responsibility of meeting the encumbrances against it and the risk of declining property values and depreciation in the value of the improvements.

It was not until plaintiffs learned of the interest of an oil company in the subject property that they bestirred themselves to ascertain whether such property was worth an effort on their part to reclaim it. As commented in *Livermore* v. *Beal* (1937), 18 Cal.App.2d 535, 549 [64 P.2d 987], "one is not permitted to stand by while another develops property in which he claims an interest, and then if the property proves valuable, assert a claim thereto, and if it does not prove valuable, be willing that the losses incurred . . . be borne by the opposite party. This thought was expressed in one case by the following language: 'If the property proves good, I want it; if it is valueless, you keep it.'" (See also *Robison* v. *Hanley* (1955), 136 Cal.App.2d 820, 824-825 [1-2] [289 P.2d 560].)

 Plaintiffs, having consented to defendants' taking possession of the property in 1951, under a claim of title, were not wronged by that act. (Civ. Code, § 3515.) Their consent was not only allowed to stand unchallenged by any action at law or in equity for nearly five years (from no later than May 4, 1951, until April 30, 1956), a period far longer than would have been available to plaintiffs for effecting redemption had strict foreclosure proceedings been had, but was apparently reaffirmed in writing in September, 1951, by the filing of the verified answer in the municipal court action. On the undisputed evidence, plaintiffs appear to be opportunists who are trying to pervert equity to recover a title and possession voluntarily surrendered in 1951, for which they then received fair value, and which they now seek to reclaim, not to right a wrong suffered by them in 1951 but to procure from defendants a value which was apparently unknown to either party until 1955. For over four years they were accepting the benefits of the transaction but now they would disavow the burden. This is not equity. (See Civ. Code, § 3521.) "The law helps the vigilant, before those who sleep on their rights." (Civ. Code, § 3527.)

Upon the facts established we are convinced that equity would not be served by permitting plaintiffs now to recover that which they surrendered for fair value. No useful pur-

pose would be served by discussion of other points urged by defendants as grounds for reversing the judgment against them.

The main judgment, as well as the ex parte order of June 12, 1957, based upon it, are reversed.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., McComb, J., and Peters J., concurred.

The petition of plaintiffs and appellants for a rehearing was denied May 27, 1959.